IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 19-638 |
| v. | : | |
| FRED C. ARENA<br>  a/k/a "McCormick Foley,"<br>  a/k/a "John S. Mosby,"<br>  a/k/a "Fritz Coon Heydrich,"<br>  a/k/a "Big 88,"<br>  a/k/a "Fritz Arena,"<br>  a/k/a "Mosby S. John" | :<br><br>:<br><br>:<br><br>: | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The defendant pled guilty to Counts One through Five of the Indictment charging him with five counts of making false statements to government officials, in violation of 18 U.S.C. § 1001, all arising from his making materially false statements to federal agents, both in person and on a federal application for a national security clearance. He now comes before the Court to be sentenced.

**I.    BACKGROUND**

On August 1, 2018, the defendant, Fred C. Arena, was interviewed at the Philadelphia Navy Yard, where he was employed by a contractor, by FBI special agents. The agents first warned Arena that Title 18, United States Code, Section 1001 made it a federal crime for him to lie to them. They read him the statute verbatim. The agents asked Arena whether he was a member of Vanguard America, an extremist organization. He said that he was not. *PSR ¶ 8, p. 3.*

On January 10, 2019, again at the Philadelphia Navy Yard, Arena completed online the necessary application to seek a national security clearance, which was a requirement for him to maintain his employment at the Navy Yard. The application was the Electronic Questionnaire for Investigations Processing, also called the Form SF-86. The Form SF-86 explicitly warned Arena

that Title 18, United States Code, Section 1001 made it a federal crime for him to lie in response to the questions asked on it. Arena certified that "(m)y statements on this form, and on any attachments to it, are true, complete, and correct to the best of my knowledge and belief and are made in good faith." and "I understand that a knowing and willful false statement on this form can be punished by a fine or imprisonment or both (18 U.S.C. 1001)." *PSR¶¶ 9, 10, p. 4.*

On the form, Arena was asked whether he had ever been a member of an organization that used, or advocated the use of, force or violence to prevent others from exercising their constitutional rights. He answered that he had not. In fact, Arena was an avowed member of Vanguard America, a white supremacist group that fits that description. *PSR¶¶ 10, 11, p.4.*

On the same application, Arena was asked whether he had property repossessed within the past seven years. He answered that he had not. In fact, Arena previously defaulted on a car loan, and his car was repossessed in 2015, well within the seven-year window. *PSR¶ 11, p. 4.*

On May 6, 2019, special agents of the Office of Personnel Management National Background Investigations Bureau (NBIB) conducted a sworn, in person interview of Arena in Philadelphia. The investigators again warned Arena that false answers to their questions could be punished by a fine or imprisonment or both under 18 U.S.C. § 1001. The investigators again asked Arena, directly, the same questions. He provided the same false answers. *PSR¶ 12, p. 4.*

Agents proved that Arena's answers were false. His membership in Vanguard America, and his participation in their activities, was proven by his many admissions on social media and in his online conversations with FBI Online Confidential Employees. Arena also posted photos online of himself wearing Vanguard America patched apparel, participating in events surrounding the 2017 Unite the Right rally in Charlottesville, Virginia, including an apparent torch lit ceremony featuring a Nazi flag and the flag of Vanguard America. *PSR¶ 13, p. 4.*

The repossession of Arena's car was also proven. Agents contacted the company that financed his purchase and learned that Arena took a car loan for $21,390 for the purchase of a Chevrolet Silverado at a dealer on November 23, 2014. Arena failed to make timely payments. The finance company thus had the car repossessed by a recovery company, who took the car from the parking lot of the Extended Stay America in Woodridge, New Jersey on July 30, 2015. *PSR ¶ 14, p. 4*

On October 24, 2019, a federal grand jury returned a five count Indictment charging the defendant with making false statements to government officials, in violation of 18 U.S.C. § 1001. On December 10, 2019, he entered an open guilty plea to those charges. He now comes before the Court for sentencing.

## II. SENTENCING CALCULATION

A. <u>Statutory Maximum Sentence</u>.

<u>Maximum Sentence per Count</u>:   A violation of 18 U.S.C. § 1001 carries a maximum penalty of five years' imprisonment, three years' supervised release, a $250,000 fine, and a $100 special assessment.

<u>Total Maximum Sentence</u>: The Court may impose a total 20 years' imprisonment, a three year period of supervised release, $1,000,000 fine, and a $400 special assessment. Forfeiture of all firearms involved in the offenses also may be ordered.

B. <u>Sentencing Guidelines Calculation</u>.   The PSR assigns Arena to Criminal History Category I, *PSR ¶ 32, p.6.* and sets his offense level at 4. *PSR ¶ 28, p.5.* This yields a guideline range of 0-6 months. *PSR ¶ 67, p.11.* The government agrees and recommends a sentence at the top of this range.

C. <u>The 18 U.S.C. § 3553(a) factors</u>:

A thorough consideration of all of the sentencing factors set forth in 18 U.S.C. § 3553(a) suggests that the most appropriate sentence in this case is one at the top of the guideline range discussed above.

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 128 S. Ct. 586, 596 (2007). Thus, the Sentencing Guidelines remain an indispensable resource for assuring appropriate and uniform punishment for federal criminal offenses.

This Court must also consider all of the sentencing considerations set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.  18 U.S.C. § 3553(a).[1]

---

[1] Further, the "parsimony provision" of Section 3553(a) states that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection."  The Third Circuit has held that "district judges are not required by the parsimony provision to routinely state that the sentence imposed is the minimum sentence necessary to achieve the purposes set forth in § 3553(a)(2). . . . '[W]e do not think that the "not greater than necessary" language requires as a general matter that a judge, having explained why a sentence has been chosen, also explain why some lighter sentence is inadequate.'"  *United States v. Dragon*, 471

Consideration of the 3553(a) Factors.

(1) The nature and circumstances of the offense and the history and characteristics of the defendant:

Arena's crime is a serious one; he repeatedly lied, in person under oath and on official government forms he signed on penalty of prosecution. He told his lies in an effort to secure a national security clearance. Specifically, Arena sought a clearance at the "secret" level. Individuals holding such a clearance are permitted access to information that, if mishandled, "could be expected to cause serious damage to the national security if disclosed without authorization." *Exec. Order No. 13526, 75 Fed. Reg. 707 (Dec. 29, 2009).* The stakes can be high, and so a clearance such as that sought by Arena is granted only after a thorough investigation, during which applicants have a duty of candor. Lies such as those told by Arena make the process far more difficult, and have the potential to frustrate the investigation entirely. A sentence at the top of the guideline range is appropriate.

Arena's history and characteristics also demonstrate the need for a sentence at the top of the recommended range. He has no criminal history. However, as the grand jury found in the Indictment, he was a member of Vanguard America, an extremist organization "that advocates or practices commission of acts of force or violence to discourage others from exercising their rights under the United States Constitution or any state of the United States." As part of his involvement in that group, Arena participated in the August, 2017, Unite the Right rally in Charlottesville, Virginia, as shown in a photo of him participating in a torch lit ceremony there, featuring a Nazi flag and the flag of Vanguard America. *PSR ¶ 13, p. 4; Exhibit 1*. The rally devolved into violence that ultimately resulted in one death and numerous injuries; and Arena

---

F.3d 501, 506 (3d Cir. 2006) (quoting United States v. Navedo-Concepcion, 450 F.3d 54, 58 (1st Cir. 2006)).

5

boasted on social media about his participation in street brawls during the rally.

Arena advanced Vanguard's hateful philosophy through intimidating social media postings that threatened violence against Jews and Muslims and advocated the lynching of women who date outside their race. In a menacing post aimed at Jews, for instance, Arena posted a photograph of himself brandishing an AR-15 type rifle, and added the comment "coming to a synagogue near you." *Exhibit 2.* In another, directed towards Muslims, Arena posted a photograph of himself brandishing a knife, and added the caption "FUCK YOU… church burning muzzies!! Come here I got something for you!!" *Exhibit 3.* In another, he posted a meme depicting a bleeding woman hanging from the neck with the caption "race mixing whores get the fucking rope!" *Exhibit 4.* Arena's actions outweigh his lack of a prior criminal history in evaluating his characteristics, including his future dangerousness, and a sentence at the top of the recommended range is appropriate in his case.

These characteristics also support the imposition of a three-year period of supervised release on Arena. The government submits that, as a condition of that supervision, Arena should be barred from membership and participation in any organization that advocates or practices unlawful acts of force or violence to discourage others from exercising their rights under the United States Constitution or any state of the United States. Under 18 U.S.C. § 3583(d), a district court "may order ... [a special condition of release] to the extent" it is "reasonably related" to any one of certain 18 U.S.C. § 3553(a) factors, including the character of the defendant and the need to protect the public from further crime. *Id; and see United States v. Turner,* 347 Fed. Appx. 866, 869 (3d. Cir. 2009). This restriction is appropriate and necessary to prevent Arena from engaging in new criminal behavior that violates the civil rights of others, and endangers the public. To that end, the Court should additionally order that Arena's social media be monitored to determine

whether he is engaging in acts similar to his previous armed threats against Jews, Muslims, and others, as discussed above.

(2) The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense:

A sentence at the top of the guideline range would incarcerate Arena for a total of six months, followed by three years of supervised release. Such a punishment is stern, but appropriate to reflect the seriousness of his crimes. It also clearly reflects society's desire that government employees, and contractors, who are granted clearances can be trusted to protect the safety and security of the public, and to tell the truth.

(3) The need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant:

As noted above, under this recommendation Arena faces a prison term, followed by a period of supervised release. He will thus be deterred from further crime. He is also now barred from reoffending by this criminal conviction, which makes it impossible for him to seek a national security clearance ever again. His supervision for three years following release will serve to protect the public.

General deterrence is also served under this recommendation, and is especially important in this case. As discussed, public safety demands that the process of vetting applicants for security clearances be thorough, and that it be accurate. It is important that applicants for such clearances understand that lying during the process will result in dire consequences. Those contemplating making false statements like Arena's would be deterred at the prospect of a similar punishment.

(4) The need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner:

Arena has either a GED or a regular high school diploma and has certifications and

experience in environmental safety and cleanup. *PSR¶¶ 59, 60, p. 10*. He has 18 years' experience in this field. *PSR¶ .62, p.10*. He thus does not need vocational training. He does not need medical treatment, mental health care, or substance abuse treatment. *PSR¶¶ 51-58, pp.8-9*.

(5) The guidelines and policy statements issued by the Sentencing Commission:

The recommendation does not run afoul of any guideline or policy statement known to the government.

(6) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct:

The government believes that this sentence would be consistent with others similarly situated.

(7) The need to provide restitution to any victims of the offense:

There is no restitution in this case.

### III. CONCLUSION

In light of the above, the government recommends that the Court impose a sentence at the top of the guideline range discussed above, that is, 6 months' imprisonment, followed by three years' supervised release.

Respectfully submitted,
WILLIAM M. McSWAIN

United States Attorney

/s/ Joseph A. LaBar
JOSEPH A. LABAR
Assistant United States Attorney

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the within Government's Sentencing Memorandum has been served this date via e mail to the following defense counsel:

>Brian J. Zeiger, Esquire
>1500 JFK Blvd
>Suite 620
>Two Penn Center
>Philadelphia, PA 19102

>/s/ Joseph A. LaBar
>JOSEPH A. LaBAR
>Assistant United States Attorney

Date: February 10, 2020